**Jeffrey S. Ratliff**
RANSOM, GILBERTSON,
MARTIN & RATLIFF, LLP
5441 S. Macadam Ave Suite 301
Portland, OR 97239
T: 503-226-3664
F: 503-243-6716
E-mail: rgmr1500@gmail.com
        jeffreysratliff@gmail.com

Of Counsel:
**Gustavo F. Bruckner**
*pro hac vice* forthcoming
**Daryoush Behbood**
*pro hac vice* forthcoming
POMERANTZ LLP
600 Third Avenue
New York, NY 10016
(212) 661-1100
E-mail: gfbruckner@pomlaw.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

| | |
|---|---|
| Sherrie Adams, derivatively on behalf of ARCIMOTO INC.,<br><br>Plaintiff,<br><br>vs.<br><br>MARK FROHNMAYER, DOUGLAS M. CAMPOLI, TERRY BECKER, JOSHUA S. SCHERER, JESSE G. EISLER, NANCY E. CALDERON, and JEFF CURL,<br><br>Defendants,<br><br>– and --<br><br>ARCIMOTO INC., an Oregon corporation,<br><br>Nominal Defendant | Civil Action No.  3:22-cv-800<br><br>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY<br><br><br>DEMAND FOR JURY TRIAL |

1 - VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Sherrie Adams ("Plaintiff"), by and through Plaintiff's undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Arcimoto Inc. ("Arcimoto" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers seeking to remedy the defendants' non-exculpable breaches of fiduciary duties and unjust enrichment beginning in 2019 and continuing to the present time (the "Relevant Period").

Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the pre-suit investigation conducted by and through her attorneys, which included, among other things, public statements made by the Company and the Individual Defendants (defined below), U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Arcimoto, news reports, securities analysts' reports, court filings in related civil lawsuits, advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation and discovery.

I.    **INTRODUCTION**

1. This is a shareholder derivative action brought for the benefit of nominal defendant Arcimoto against certain current and/or former officers and directors based on their non-exculpable breaches of fiduciary duty and other serious misconduct as alleged in detail herein.

2. In October 2019, after years of development, redesigns, and numerous vehicle recalls filed with the National Highway Traffic Safety Administration ("NHTSA"), Arcimoto had just begun retail production of its featured product,

the Fun Utility Vehicle ("FUV"). The FUV is a small, two-passenger, three-wheel electric vehicle approximately one third the size of a standard car. According to the Company's 2019 annual report, the FUV is generally regulated as a motorcycle-class vehicle.

3.  As Arcimoto's 2019 annual report explained, "[t]he Company has not achieved positive earnings and operating cash flows to enable the Company to finance its operations internally, which raises substantial doubt about its ability to continue as a going concern." Indeed, as the report indicated, at the end of 2019 the Company had only $5.8 million in cash, after burning through a net loss from operations of nearly $15 million that year.

4.  During 2019 and into 2020, Arcimoto was still largely reliant on outside investments in order to finance the Company's operations. In October 2019, still facing this acute pressure to impress outside investors (and current stockholders), the Individual Defendants announced Arcimoto's first rental franchise partnership with a company in Key West called R-KEY-MOTO LLC ("R-KEY-MOTO").

5.  Unbeknownst to Arcimoto stockholders, R-KEY-MOTO was owned and controlled by FOD Capital LLC ("FOD Capital") and its managing director, Michael Raymond ("Raymond"). At that time, when Arcimoto was touting its long-awaited initial production of vehicles and its new rental franchise arrangement with R-KEY-MOTO, FOD Capital and Raymond were Arcimoto's second-largest shareholders, as owners of 9.3% of the Company's common stock and voting rights. Thus, R-KEY-MOTO was actually an undisclosed related party, and the Company's transaction with R-KEY-MOTO was an undisclosed material related party transaction.

6. In March 2021, Bonitas Research LLC ("Bonitas") published a report documenting, among other problems at the Company, the undisclosed relationship between Arcimoto and R-KEY-MOTO.

7. A few weeks after publication of the Bonitas Report, the Individual Defendants caused the Company to confirm the undisclosed material related-party transactions with entities owned and controlled by FOD Capital. Arcimoto's 2021 Proxy Statement disclosed that, contrary to the Company's prior public statements, including statements in its 2020 Proxy Statement: "During the years ended December 31, 2019 and 2020, we sold FUVs for $166,203 and $155,688 respectively, to entities controlled by FOD Capital LLC, a 5% shareholder of our common stock."

8. In addition to FOD Capital being Arcimoto's second-largest stockholder and single largest outside investor at the time of the R-KEY-MOTO announcement, the Individual Defendants had previously caused the Company to enter into multiple agreements with FOD Capital and Raymond with respect to FOD Capital's investment in Arcimoto. These agreements were signed by Arcimoto's founder, Chairman, President, and Chief Executive Officer ("CEO"), defendant Mark Frohnmayer ("Frohnmayer"), on behalf of Arcimoto and by Raymond on behalf of FOD Capital. The Individual Defendants must have negotiated and corresponded with Raymond and FOD Capital in signing these agreements. Indeed, part of the Company's financing arrangements with FOD Capital involved granting FOD Capital franchise rights in the Key West area. Therefore, when the Individual Defendants negotiated and caused the Company to enter into the transaction with R-KEY-MOTO, also with Raymond, they either knew or were

severely reckless in not knowing that R-KEY-MOTO was a related party.

9. This gambit was successful. Following the R-KEY-MOTO announcement, approximately $82 million was raised from the sale of the Company's common stock, made possible as Arcimoto's stock price skyrocketed from approximately $3 per share to nearly $17 per share. The increased share price also allowed the Company to retire over $1.3 million in convertible notes in June 2020 through converting the notes into shares, rather than paying cash.

10. The Company was still slowly ramping up its production capacity. Arcimoto delivered less than 100 vehicles in each of 2019 and 2020. The revenues from these limited sales were far from sufficient to be able to sustain the Company's operations without the $82 million the Company raised, particularly given its rate of operating losses. Thus, Arcimoto was reliant on outside investments to maintain continued operations. The Individual Defendants knew exactly what they were doing in hyping up their new Key West partnerships as they misleadingly omitted that their business partner was not a true, independent customer, but rather a related party owned and controlled by Arcimoto's second-largest stockholder.

11. SEC regulations, U.S. Generally Accepted Accounting Principles ("GAAP"), and NASDAQ rules require the disclosure of material related party transactions. The Individual Defendants' failure to disclose R-KEY-MOTO as a related party violated SEC regulations, GAAP, and/or NASDAQ rules, and rendered their public statements to stockholders materially false and misleading.

## II.    JURISDICTION AND VENUE

12. This Court has jurisdiction over all claims under 28 U.S.C. § 1332(a) because

there is complete diversity between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

13. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14. This Court has personal jurisdiction over each defendant because each defendant is either a corporation conducting business and maintaining operations in this district or an individual who is either present in this district for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities markets, such that each defendant has sufficient minimum contacts with this district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because: (i) nominal defendant Arcimoto maintains its principal place of business in this district; (ii) one or more of the defendants resides or maintains offices in this district; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this district; and (iv) defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.

III.    **THE PARTIES**

**Plaintiff**

16. Plaintiff is a current holder of Arcimoto common stock and has continuously held Arcimoto common stock at all relevant times.  Plaintiff is a citizen of California.

**Nominal Defendant**

6 - VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

17. Nominal defendant Arcimoto is a publicly traded Oregon corporation headquartered in Eugene, Oregon. The Company's common stock trades on the NASDAQ exchange under the ticker symbol "FUV". Arcimoto's public filings state that Arcimoto operates in the business of manufacturing small, two-passenger, three-wheeled electric vehicles.

**The Individual Defendants**

18. Defendant Frohnmayer is Chairman of the Board and also serves as Arcimoto's CEO and President, and has been since November 2007. Defendant Frohnmayer founded Arcimoto in November 2007. Upon information and belief, defendant Frohnmayer is a citizen of Oregon.

19. Defendant Terry L. Becker ("Becker") is Arcimoto's Chief Operating Officer ("COO") and has been since September 2017, and also serves as a director and has been since May 2015. Defendant Becker was a member of Arcimoto's Audit Committee in at least April 2018. Upon information and belief, defendant Becker is a citizen of Oregon.

20. Defendant Douglas M. Campoli ("Campoli") is Arcimoto's Chief Financial Officer ("CFO") and Treasurer and has been since June 2015. Defendant Campoli also served as Arcimoto's Secretary from June 2015 to October 2020. Upon information and belief, defendant Campoli is a citizen of Oregon.

21. Defendant Joshua S. Scherer ("Scherer") is Arcimoto's Lead Independent Director and has been since September 2018. Defendant Scherer is a member of Arcimoto's Audit Committee and has been since at least April 2019. Upon information and belief, defendant Scherer is a citizen of New York.

22. Defendant Jesse G. Eisler ("Eisler") is an Arcimoto director and has been since

September 2018. Defendant Eisler is a member of Arcimoto's Audit Committee and has been since at least April 2019. Upon information and belief, defendant Eisler is a citizen of Connecticut.

23. Defendant Nancy E. Calderon ("Calderon") is an Arcimoto director and has been since April 2020. Defendant Calderon is Chair and a member of Arcimoto's Audit Committee and has been since at least April 2020. Upon information and belief, defendant Calderon is a citizen of Nevada.

24. Defendant Jeff Curl ("Curl") was an Arcimoto director from May 2015 to January 2020. Defendant Curl was also Chair of Arcimoto's Audit Committee from at least April 2018 to at least April 2019, and a member of that committee from at least April 2018 to at least January 2020. Upon information and belief, defendant Curl is a citizen of Oregon.

25. Defendants Frohnmayer, Becker, Calderon, Campoli, Scherer, Eisler and Curl are collectively referred to herein as the "Individual Defendants."

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS

26. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit. Each director and officer owed to the Company

and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

27. The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

28. At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

29. To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

a.      manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b.      neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

c.      establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.      neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e.   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.   ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.   remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

30. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

31. The Audit Committee Defendants owed specific duties to Arcimoto under the Audit Committee Charter ("Audit Charter"). According to the Audit Charter, the Audit Committee's purpose is as follows:

> While the fundamental responsibility for the Company's financial statements and disclosures rests with management and the independent auditor, the audit committee will review (A) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (B) analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principle ("GAAP") methods on the financial statements; (C) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; and (D) the type and presentation of information to be included in earnings press releases (paying particular attention to any use of "pro forma," or "adjusted" non- GAAP, information), as well as review any financial information and earnings guidance provided to analysts and rating agencies.

32. Arcimoto further maintains a Code of Ethics and Business Conduct for employees, officers, and directors of Arcimoto (the "Ethics Code") which applied to all of the Individual Defendants. The purpose of the Ethics Code is to, among other things:

a.      promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest;

b.      promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the SEC and in other public communications made by the Company;

c.      promote compliance with applicable governmental laws, rules and regulations;

d.      promote the protection of Company assets, including corporate

opportunities and confidential information;

      e.      promote fair dealing practices;

      f.      deter wrongdoing; and

      g.      ensure accountability for adherence to the Code.

33. The Ethics Code further requires "Honest and Ethical Conduct", specifically stating that it is "[t]he Company's policy is to promote high standards of integrity by conducting its affairs honestly and ethically." The same section requires that "[e]ach director, officer and employee must act with integrity and observe the highest ethical standards of business conduct in his or her dealings with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her job."

34. The Ethics Code explicitly requires that "employees, officers and directors should comply, both in letter and spirit, with all applicable laws, rules and regulations in the cities, states and countries in which the Company operates."

35. Section 5 of the Ethics Code, called "Disclosure", contains the following rules:

5.1 The Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules.

5.2 Each director, officer and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained. Each director, officer and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel.

5.3 Each director, officer and employee who is involved in the Company's disclosure process must:

(a) be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and

(b) take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

## V.      FACTS

### A.      Arcimoto's Background and Operations

36. According to Arcimoto's annual report for 2019, filed with the SEC on Form 10-K on April 14, 2020 ("2019 10-K"), Arcimoto was founded in 2007. According to the 2019 10-K, Arcimoto is "engaged primarily in the design, development and manufacture of ultra-efficient three-wheeled electric vehicles."

37. The Company went public in September 2017 through a Regulation A+ offering. Under Title IV of the 2015 Jumpstart Our Business Startups (JOBS) Act, a private company can raise public funding through a Regulation A+ offering, which involves a more streamlined, expedited review process. In a Regulation A+ offering, a company is required to make its offering memorandum public just 21 days prior to SEC qualification, with a lower level of scrutiny than for a traditional public offering.

38. According to the 2019 10-K, "2019 was a watershed year for the Company, which saw us complete compliance testing required to produce and sell retail vehicles, outfit the scalable, automated, vertically-integrated Arcimoto Manufacturing Plant for retail production; begin retail production of the Fun Utility Vehicle (FUV); develop our post-production programs including service, support, recall and supplier quality management; and sign, open, and deliver first vehicles to our first rental franchisee in Key West, Florida."

39. The Company first started retail production of its vehicles in September 2019, but by the end of the year it had produced only 57 vehicles and delivered only 46 of

them to customers. As the Company explained in its 2019 10-K, it started retail production at "one FUV per build day and ramped to two per build day in the first quarter of 2020, prior to the COVID-19 production shutdown."

40. According to Arcimoto's annual report for 2020, filed with the SEC on Form 10-K on March 31, 2021 ("2020 10-K"), in 2020, Arcimoto produced only 117 vehicles and delivered just 97 of them to customers.

41. According to the 2019 10-K, Arcimoto's flagship product is the FUV. The FUV is a small, two-passenger, three-wheel electric vehicle approximately one third the size of a standard car. According to the Company's 2019 annual report, the FUV is generally subject to federal regulations as a motorcycle-class vehicle. In the 2019 10-K, the Individual Defendants caused the Company to report having approximately 4,200 FUV "pre-orders," secured with small refundable deposits. These "pre-orders" were typically $100 deposits that secured a customer's place in the production queue. They were fully refundable until the customer's order was ready for production. The FUV retailed for approximately $20,000 per vehicle.

42. The Company encountered significant struggles in producing a street-ready vehicle ready for actual customers. According to the NHTSA, by the time Arcimoto was beginning its retail production in September 2019, the Company had already filed ten recalls for major safety issues affecting its 2017 FUV models and nine more affecting its 2018 FUVs. The Company also issued eleven recalls for major safety issues affecting its 2019 FUVs during 2019 and 2020.

**B.    FOD Capital Makes a Major Investment in Arcimoto, and Owns and Controls R-KEY- MOTO and Wahlburgers Key West, Which the Individual Defendants Knew Were Related Parties**

43. On December 28, 2018, the Individual Defendants caused Arcimoto to file a current report with the SEC on Form 8-K ("December 28, 2018 8-K"), which was signed by defendant Campoli, announcing that the Company had entered into a Subscription Agreement with FOD Capital, pursuant to which the Company issued FOD Capital 500,000 shares of Arcimoto common stock, a warrant to purchase up to 942,857 additional shares, and a senior secured note in the principal amount of $3,000,000.

44. Filed with the December 28, 2018 8-K as Exhibit 4.1 was a copy of the Subscription Agreement between Arcimoto and FOD Capital. The Subscription Agreement was signed by defendant Frohnmayer, in his capacity as CEO of Arcimoto, and Raymond, as manager of FOD Capital.

45. Also filed with the December 28, 2018 8-K as Exhibits 10.1, 10.2, 10.3, and 10.4, respectively, were copies of the Senior Secured Promissory Note, Security Agreement, Intellectual Property Security Agreement, and Collateral Assignment of Lease referenced in the December 28, 2018 8-K. Each of these four documents were signed by defendant Frohnmayer, in his capacity as CEO of Arcimoto, and Raymond, as manager of FOD Capital. The Intellectual Property Security Agreement and the Collateral Assignment of Lease also included the address for FOD Capital: 7009 Shrimp Rd, STE #4, Key West, FL 33040.

46. On December 27, 2018, the Individual Defendants caused Arcimoto to file a prospectus with the SEC on Form 424B5 in connection with FOD Capital's investment in the Company. According to the prospectus, Arcimoto had

14,532,341 shares of common stock outstanding before FOD Capital's investment, and 15,975,198 shares outstanding after, assuming full exercise of the warrant. That means that FOD Capital owned approximately 9.0% of Arcimoto at this time.

47. On January 4, 2019, FOD Capital and Raymond filed a joint Schedule 13G report with the SEC, signed by Raymond both individually and as Manager of FOD Capital. In this Schedule 13G, FOD Capital and Raymond confirmed that they were the beneficial owners of 1,442,857 shares of Arcimoto common stock, comprising 9.0% of the Company's outstanding shares of common stock. The January 4, 2019 Schedule 13G also included FOD Capital's address: 7009 Shrimp Rd, STE #4, Key West, FL 33040.

48. On April 1, 2019, the Individual Defendants caused Arcimoto to file a proxy statement with the SEC on Form DEF 14A, signed by defendant Frohnmayer. In this proxy statement, the Individual Defendants disclosed that FOD Capital beneficially owned a total of 1,442,857 shares of the Company's common stock, or 9.3% of the shares outstanding. According to the proxy statement, that ownership stake made FOD Capital the Company's second largest stockholder, trailing only defendant Frohnmayer. Thus, at this time FOD Capital was Arcimoto's single largest outside investor.

49. On September 18, 2019, the Individual Defendants caused Arcimoto to file a current report with the SEC on Form 8-K, signed by defendant Campoli, announcing that the Company had entered into a Restated Subscription Agreement with FOD Capital. Under the Restated Subscription Agreement, the Company issued to FOD Capital a convertible note for $500,000, and granted

FOD Capital "franchise rights for the Florida Keys." The signature blocks for the Restated Subscription Agreement and corresponding Convertible Promissory Note, attached to the current report as Exhibits 4.1 and 10.1, respectively, each provided for defendant Frohnmayer to sign as CEO of Arcimoto, and Raymond as manager of FOD Capital.

50. On November 22, 2019, the Individual Defendants caused Arcimoto to file a prospectus with the SEC on Form 424B4, in connection with an offering of up to 5,750,000 shares of common stock for up to $9.3 million. According to this prospectus, FOD Capital was the beneficial owner of 1,562,088 shares as of November 14, 2019, which amounted to 8.0% of the Company. According to this prospectus, these holdings made FOD Capital the Company's third largest shareholder at this time.

51. FOD Capital's website lists Raymond as its Managing Director, on a page titled "Our Leadership."[1] The same webpage lists FOD Capital's address as: 7009 Shrimp Road, Suite 4, Key West, FL 33040.2.

52. R-KEY-MOTO is registered in Florida. Its registered principal address is listed as: 7009 Shrimp Rd Ste 4, Key West, FL 33040. Raymond is listed as the registered agent and manager of R-KEY-MOTO, at the same address. Upon information and belief, based on the facts alleged herein, R-KEY-MOTO is owned and controlled by FOD Capital and Raymond.

53. According to the restaurant inspection database provided by the *Tallahassee Democrat*, a Florida-based newspaper, Wahlburgers Key West is owned by

---

[1] Available at https://www.fodcapital.com/leadership-team

Wahlkey LLC ("Wahlkey").[2] The website Bizapedia, citing the Florida Department of State as its source, also lists Wahlkey as the owner and sole principal of Wahlburgers Key West.[3]

54. Wahlkey is registered in Florida. Its registered principal address is 7009 Shrimp Rd Ste 4, Key West, FL 33040.  Raymond is listed as the registered agent and manager of Wahlkey, at the same address. Upon information and belief, based on the facts alleged herein, Wahlkey, and thus Wahlburgers Key West, are owned and controlled by FOD Capital and Raymond.

55. Arcimoto had no more than three executive officers at the relevant times, two of whom were defendants Frohnmayer and Campoli. FOD Capital has and had at the relevant time only three principals, one of whom was and is Raymond.

56. In the course of discussing, negotiating, and signing the myriad agreements between Arcimoto and FOD Capital, R-KEY-MOTO, and Wahlburgers Key West, the Individual Defendants must have known, or were severely reckless in not knowing, that R- KEY-MOTO and Wahlburgers Key West were owned and controlled by FOD Capital and Raymond. Arcimoto's own press release announcing the R-KEY-MOTO deal referred to Raymond as a principal of R-KEY-MOTO and included a direct quote from Raymond. These facts, along with the Company's history of business dealings with FOD Capital, R-KEY-MOTO, and Walhburgers Key West, demonstrate that the Individual Defendants knew, or were severely reckless in not knowing, that R-KEY-MOTO

---

[2] Available    at
https://data.tallahassee.com/restaurant-inspections/monroe/wahlburgers-key-west/sea5428354/7662717/

[3] Available at https://www.bizapedia.com/fl/wahlburgers-key-west.html

18 - VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and Wahlburgers Key West were related parties to Arcimoto.

57. While stockholders parsing through each of these various public filings may have been able to deduce the connection between FOD Capital and R-KEY-MOTO if they were actively seeking out that information, they were under no obligation to do so, the connection was not well known to stockholders, and the Individual Defendants' false and misleading omissions concerning the Company's related party transactions deceived stockholders and would not have alerted stockholders as to the need for any such independent sleuthing.

## VI.    THE INDIVIDUAL DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

58. During 2019, 2020, and well into 2021, the Individual Defendants made a series of materially false and misleading statements concerning R-KEY-MOTO. In addition to the statements identified above, the Individual Defendants' materially false and misleading statements include the following:

### A.    False and Misleading 2019 Statements

59. On October 2, 2019, the Individual Defendants caused Arcimoto to issue a press release announcing its first rental franchise. In relevant part, the press release stated:

Arcimoto, Inc.®, (NASDAQ: FUV) makers of the Fun Utility Vehicle® (FUV®), Rapid Responder™, and Deliverator™ — affordable, practical, and joyful pure electric vehicles for everyday commuters and fleets — announced today that it has signed its first rental franchise, which will open in the Florida Keys and be operated by Key West-based franchisee R-KEY-MOTO, LLC.

"We think Key West will be an amazing home for our first rental franchise and pilot of our rental franchise model," said Arcimoto founder and president Mark Frohnmayer. "We are very excited to partner with the R-KEY-MOTO team, combining their local market expertise and resources with Arcimoto's ultra-efficient and very fun vehicles."

Located at the Stock Island Marina Village, the new FUV Hub location will house

21 FUVs to be used as rental vehicles for tourists and cruise ship passengers to explore Key West, one of the most popular tourist destinations in the world. In addition, the FUV Hub will share vehicles with the A&B Marina Complex and the Perry Hotel Key West. Guests will be able to rent FUVs directly from the concierge and explore Stock Island and Key West.

60. On November 26, 2019, the Individual Defendants caused Arcimoto to issue a press release announcing that it had "delivered the first two of 21 FUVs to R-Key-Moto, LLC, Arcimoto's first rental franchise and flagship rental outlet, located in the beautiful Florida Keys." The November 26, 2019 press release also quoted defendant Frohnmayer as saying: "It was a distinct honor to personally deliver the first two Fun Utility Vehicles to our Key West franchise partner. R-Key-Moto's top-notch facilities are a perfect home for Arcimoto's pioneer franchise fleet."

**B.    False and Misleading 2020 Statements**

61. On April 14, 2020, the Individual Defendants caused Arcimoto to issue its 2019 10-K. The 2019 10-K was signed by defendants Frohnmayer, Campoli, Becker, Thurston, Scherer, and Eisler. The 2019 10-K made the following statement with regard to revenues generated through transactions with related parties: "For 2019 we had revenue from the sale of our vehicles of $891,356, $20,015 of which was with a related party." The 2019 10-K reported 2019 revenues of $891,356 from product sales, and $96,494 from other sources, each a nearly 10-fold increase over the prior year. The 2019 10-K also touted the Company's Key West business, underlining the importance of the transaction to the Company's business. Specifically, the 2019 19-K stated that: "2019 was a watershed year for the Company, which saw us ... sign, open, and deliver first vehicles to our first rental franchisee in Key West, Florida."

62. Appended as exhibits to the 2019 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by defendants Frohnmayer and Campoli, wherein they certified that the 2019 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "information contained in the Report fairly presents, in all material respects, the financial condition of the registrant at the end of the period covered by the Report and results of operations of the registrant for the periods covered by the Report."

63. Also on April 14, 2020, the Individual Defendants caused Arcimoto to issue a press release, attached as Exhibit 99.1 to a current report filed with the SEC on Form 8-K. The April 14, 2020 8-K was signed by defendant Campoli, and stated: "At the end of 3Q19, the Company signed its first rental franchise in Key West with R-KEY-MOTO, LLC and subsequently delivered its first 8 FUVs to the franchisee by the end of 2019."

64. On April 29, 2020, the Individual Defendants caused Arcimoto to issue a notice of its annual meeting of shareholders and 2020 Proxy Statement with the SEC on Form DEF 14A ("2020 Proxy Statement"). The 2020 Proxy Statement was signed by defendant Frohnmayer and made the following statement as to material related party transactions entered into by the Company since 2019, omitting any mention of Arcimoto's transaction with R-KEY-MOTO:

CERTAIN RELATIONSHIPS AND RELATED-PARTY TRANSACTIONS

Since January 1, 2019, except as set forth below, there were no transactions to which we were or are a party in which the amount involved exceeded or exceeds $120,000 and any of our directors or executive officers, any holder of 5% of our capital stock or any member of their immediate family had or will have a direct or

indirect material interest.

65. On June 11, 2020, the Individual Defendants caused Arcimoto to issue its quarterly report for the first quarter of 2020 with the SEC on Form 10-Q ("20Q1 10-Q"). The 20Q1 10-Q was signed by Defendant Campoli. In the 20Q1 10-Q, the Company reported "approximately $598,000 in revenue from the sales of our vehicles" for the quarter.

66. Appended as exhibits to the 20Q1 10-Q were SOX certifications signed by defendants Frohnmayer and Campoli, wherein they certified that the 20Q1 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "information contained in the Report fairly presents, in all material respects, the financial condition of the registrant at the end of the period covered by the Report and results of operations of the registrant for the periods covered by the Report."

67. On August 19, 2020, the Individual Defendants caused Arcimoto to issue its quarterly report for the second quarter of 2020 with the SEC on Form 10-Q ("20Q2 10-Q"). The 20Q2 10-Q was signed by defendant Campoli. In the 20Q2 10-Q, the Company reported "approximately $255,000 in revenue from the sales of our vehicles" for the quarter, and $853,000 for the first six months of the year.

68. Appended as exhibits to the 20Q2 10-Q were SOX certifications signed by defendants Frohnmayer and Campoli, wherein they certified that the 20Q2 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances

22 - VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

under which such statements were made, not misleading with respect to the period covered by this report" and that "information contained in the Report fairly presents, in all material respects, the financial condition of the registrant at the end of the period covered by the Report and results of operations of the registrant for the periods covered by the Report."

69. On November 16, 2020, the Individual Defendants caused Arcimoto to issue its quarterly report for the third quarter of 2020 with the SEC on Form 10-Q ("20Q3 10-Q"). The 20Q3 10-Q was signed by defendant Campoli. In the 20Q3 10-Q, the Company reported "approximately $620,000 in revenue from the sales of our vehicles" for the quarter, and $1,473,000 for the first nine months of the year.

70. Appended as exhibits to the 20Q3 10-Q were SOX certifications signed by defendants Frohnmayer and Campoli, wherein they certified that the 20Q3 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "information contained in the Report fairly presents, in all material respects, the financial condition of the registrant at the end of the period covered by the Report and results of operations of the registrant for the periods covered by the Report."

71. In addition to misleading stockholders as to the Company's transaction with R-KEY- MOTO, the Individual Defendants also flaunted another partnership with an undisclosed related party owned and controlled by FOD Capital. On July 22, 2020, the Individual Defendants caused Arcimoto to announce a high-profile pilot program with Wahlburgers Key West, a franchise of the casual dining burger

restaurant chain, to test one Arcimoto's vehicles. In relevant part, Arcimoto's

press release stated:

Arcimoto, Inc.® (NASDAQ: FUV), makers of the Fun Utility Vehicle® (FUV®), Rapid Responder™, and Deliverator™— affordable, practical, and joyful pure electric vehicles for everyday commuters and fleets—and Wahlburgers are teaming up on a pilot program to field test the Deliverator, Arcimoto's ultra-efficient, three-wheel electric vehicle designed for local and last-mile delivery. The pilot program is anticipated to begin this August at the newest Wahlburgers location coming to the boardwalk of the world- renowned Historic Key West Seaport from the restaurant brand founded by Chef Paul Wahlberg along with brothers Donnie and Mark.

### C.    The Individual Defendants Effectuate Sales of Arcimoto Stock

72. On October 4, 2019, just two days after announcing the R-KEY-MOTO rental

franchise, the Individual Defendants caused Arcimoto to file a prospectus

supplement with the SEC on Form 424B5, announcing it was selling just over one

million shares of its common stock for net proceeds of approximately $2.144

million.

73. On November 22, 2019, the Individual Defendants caused Arcimoto to file a

prospectus with the SEC on Form 424B4, announcing it was selling up to

5,750,000 more shares of its common stock for net proceeds of up to

approximately $9.3 million.

74. In the 2019 10-K, the Company disclosed that in 2019 it raised nearly $15 million

from sales of its common stock. The Company also disclosed that it suffered a net

loss from operating activities of over $15 million in 2019.

75. In the 2020 10-K, the Company disclosed that in 2020 it raised approximately

$56.8 million from sales of its common stock. The Company also disclosed that it

suffered a net loss from operating activities of over $18 million in 2020.

76. On May 17, 2021, the Individual Defendants caused Arcimoto to issue its

quarterly report for the first quarter of 2021 with the SEC on Form 10-Q ("21Q1 10-Q"). The 21Q1 10-Q disclosed that in the first quarter of 2021, Arcimoto raised over $14 million from sales of its common stock. The Company also disclosed that it burned through approximately $5.5 million in net cash from operating activities during that quarter.

77. According to the 2020 10-K, the Company was also able to use its elevated stock price to retire over $1.3 million in convertible notes using shares of its common stock instead of paying cash. As the 2020 10-K described, on June 25, 2020, "principal amounts of $1,310,893 … were converted into 333,924 shares of common stock at a conversion price of $4.25 per share."

78. These capital raises were critical to the Company, which was reliant on outside financing to fund and maintain its operations. During 2019 and 2020, the Individual Defendants were able to raise over $80 million as the Company took advantage of investor excitement generated in part by its announced R-KEY-MOTO partnership in Key West, and the Company's stock price soared from $3 to almost $17.

## VII.   THE TRUTH IS REVEALED

79. On March 23, 2021, before markets opened, the Bonitas Report was published, revealing that *some of Arcimoto's most prominent partners and customers were in fact owned and controlled by a related party.* The Bonitas Report stated, in pertinent part:

LARGEST    CUSTOMER IS    UNDISCLOSED    RELATED    PARTY FOD CAPITAL

Additional evidence corroborates that there exists little demand for Arcimoto's vehicles from independent paying customers.

Our findings revealed that as of March 2021, Arcimoto Key West had 13 Arcimoto vehicles on-site, making it the single largest location of Arcimoto vehicles worldwide outside of Eugene, Oregon (Arcimoto's HQ).

In 4Q'19, Arcimoto announced its first rental franchisee customer in Key West as R-Key-Moto, LLC ("R-KeyMoto").

Arcimoto Founder Mark Frohnmayer boasted on FUV's 1Q'20 earnings call that R-Key-Moto was "almost up to their full plan of 20 vehicles."

In Arcimoto's 3Q'2020 earnings conference call webinar highlighted the franchisee partnership as a success.

*       *       *

However, Arcimoto never mentioned in its investor communications via SEC filings, presentations, earnings calls or promotional videos that R-Key-Moto is an undisclosed related party owned by insider FOD Capital, LLC ("FOD Capital").

While Founder Mark Frohnmayer boasted in the 1Q'20 Earnings Call that R-Key-Moto was "almost up to their full plan of 20 vehicles", Arcimoto never disclosed any related party revenues from FOD Capital, which at US$ 20,000 per vehicle would amount up to US$ 420,000, or 29% of Arcimoto's total product revenue in 4Q'19 and 1Q'20.

R-Key-Moto's 2020 Annual Report lists Michael Raymond and Matthew Strunk as Managers, who are respectively the Managing Director and Director of Accounting and Finance of FOD Capital.

In addition, R-Key-Moto shares the same registered address as FOD Capital.

*       *       *

In 3Q'20, Arcimoto promoted a pilot program for its Deliverator vehicle with Wahlburgers Key West, whipping up investors' hope for a nation-wide deal with the Mark Wahlberg restaurant chain.

Arcimoto once again failed to disclose that Wahlburgers Key West is actually operated as a franchise location by Wahlkey, LLC ("Wahlkey"), which is owned by undisclosed related party shareholder FOD Capital.

Wahlkey's 2021 Annual Report lists Michael Raymond as its manager and the same address as FOD Capital.

80. On this news, Arcimoto's stock price fell $1.10 per share from the prior trading day, or approximately 6.6%, to close at $15.67 per share on March 23, 2021 on unusually high trading volume, damaging stockholders and the Company.

81. To the extent that facts showing that R-KEY-MOTO was owned and operated by FOD Capital and Raymond were publicly accessible, they were not well-known to Arcimoto stockholders. Thus, disclosure of R-KEY-MOTO as a related party would have significantly altered the total mix of information available to stockholders about Arcimoto's transaction with R-KEY-MOTO.

82. Arcimoto stockholders were not required to parse through registration information from other businesses, or other publicly available documents unrelated to Arcimoto itself. Conversely, the Individual Defendants, through their direct, repeated interactions with FOD Capital and Raymond, knew or were severely reckless in not knowing, that R-KEY-MOTO was owned and operated by FOD Capital and Raymond. Accordingly, the Bonitas Report was the first instance when Arcimoto stockholders were apprised that R-KEY-MOTO was an undisclosed related party.

83. On April 29, 2021, just weeks after the Bonitas Report was published, the Individual Defendants **admitted** the existence of undisclosed material related-party transactions with entities owned and controlled by FOD Capital. Specifically, in a proxy statement filed that day with the SEC on Form 14A, the Individual Defendants caused Arcimoto to disclose that:

CERTAIN RELATIONSHIPS AND RELATED-PARTY TRANSACTIONS

*　　　*　　　*

During the years ended December 31, 2019 and 2020, we sold FUVs for $166,203 and $155,688 respectively, to entities controlled by FOD Capital LLC, a 5% shareholder of our common stock. FOD Capital, LLC also holds franchise rights for the Florida Keys, subject to certain modifications to the terms of our standard franchise agreement including, but not limited to, a right of first refusal for any Company rental franchise in the South Beach Region of Miami Beach, Florida. During 2020 we also received $6,258 in franchise royalties from entities controlled by FOD Capital. Based on a Schedule 13G/A filed with the SEC on

February 12, 2021, FOD Capital, LLC indicated their shareholdings are less than 5% of the Company as of that date.

84. This admission, mere weeks after publication of the Bonitas Report, directly exposed the falsity of the Individual Defendants' statements in the 2020 Proxy Statement, filed in April 2020, which omitted the Company's transaction with FOD Capital and R-KEY-MOTO in purportedly describing related party transactions of at least $120,000 "[s]ince January 1, 2019."

85. According to the 2019 10-K, in 2019, Arcimoto's total revenues from sales of its vehicles were $891,356. Thus, the undisclosed related party transactions consisting of the Company's sales of FUVs to FOD Capital represented nearly one fifth of the Company's vehicle sales revenues in 2019, and about 17% of its total revenues.

86. According to the 2020 10-K, in 2020, Arcimoto's total revenues from sales of its vehicles were approximately $2,040,000. Thus, the undisclosed related party transactions consisting of the Company's sales of FUVs to FOD Capital represented approximately 8% of the Company's vehicle sales revenues in 2020, and about 7% of its total revenues.

87. The Bonitas Report also revealed that the Individual Defendants had misled stockholders with regard to preorders and number of vehicles actually delivered. Although Arcimoto had claimed 422 preorders for the FUV, it had actually only delivered nineteen vehicles.

88. The Bonitas Report also disclosed that that Arcimoto had "concealed safety concerns" regarding its FUV. Specifically, the Bonitas Report stated:

On November 18, 2020, Arcimoto filed a total production recall notice with the United States Government's federal agency, the National Highway Traffic Safety Administration [("NHTSA")] (https://www.nhtsa.gov/), due to safety issues with

the electronic drivers in the vehicles which can "lead to unexpected battery shutdown and immediate loss of traction power."

*    *    *

Instead of notifying customers and investors of the bad news, the next day on November 19, 2020 Arcimoto management promoted a 90-day trial with the City of Orlando's first responder units.

In March 2021 we spoke with sales representatives at both Arcimoto KeyWest and GoCar Tours and confirmed that neither customer had been notified of Arcimoto's November 2020 product safety recall.

Arcimoto's November 2020 recall was preceded by two other recalls in March & May 2020 due to non-compliant brake hoses and improper traction-power harness that can lead to, among other things, "risk of fire, and loss of traction-power."

89. In fact, according to the NHTSA website, between 2017 and 2021, Arcimoto issued forty-four recall notices for the FUV. Notwithstanding, Arcimoto's 2020 10-K states: "The Company has had various recalls for issues that have been discovered, which have been partially completed. All proper protocols have been followed for reporting these recalls to NHTSA and to our customers in a timely manner." Considering the number of recalls and the number of vehicles those recalls have affected, this is a vague and misleading statement that failed to inform stockholders of the truth regarding safety concerns surrounding Arcimoto's vehicles.

90. In April 2021, Arcimoto issued a recall notice for all 2019 through 2021 FUV, Deliverator, Rapid Responder, and Roadster models due to a firmware problem that could lead to an unexpected battery shutdown. The recall affects 252 vehicles – or 100% of all vehicles released by Arcimoto.

**A.    The Omission of the Related Party Transactions Violated Item 404(a) of Regulation S-K**

91. Item 404(a) of Regulation S-K (17 C.F.R. § 229.404) requires the disclosure of

"any transaction, since the beginning of the registrant's last fiscal year, or any

currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."

92. Item 404(a) requires the disclosure of (a) the name of the related party and the basis of the relation; (b) the related party's interest in the transaction, including the related party's relationship with an entity that is a party to, or has an interest in, the transaction; (c) the approximate dollar value of the transaction; (d) the approximate dollar value of the related party's interest in the transaction; and (e) any other material information regarding the transaction or the related party in light of the circumstances of the transaction.

93. The Instructions to Item 404(a) define term related person to include: "b. Any person who was in any of the following categories when a transaction in which such person had a direct or indirect material interest occurred or existed: i. A security holder covered by Item 403(a) (§ 229.403(a))." Section 229.403(a) covers "the beneficial owner of more than five percent of any class of the registrant's voting securities."

94. Per the SEC's interpretation, Item 404(a) of Regulation S-K (17 C.F.R. § 229.404) "requires, in pertinent part, disclosure of any transaction since the beginning of the registrant's last fiscal year between the registrant and any 5 percent shareholder where the amount involved exceeds $120,000 and the 5 percent shareholder has a direct or indirect material interest in the transaction." Item 404 of Regulation S-K -- Transactions with Related Persons, Promoters and Certain Control Persons.

95. R-KEY-MOTO was a related party of Arcimoto under Item 404(a) due to its

ownership and control by FOD Capital and Raymond, who, as the Company disclosed, owned over 5% of Arcimoto's common stock and voting interests, including at the time of Arcimoto's transaction with R-KEY-MOTO.

96. The Company's transaction, or to the extent it was not yet consummated, proposed transaction, with R-KEY-MOTO was over $120,000, as the Company admitted that "During the years ended December 31, 2019 and 2020, we sold FUVs for $166,203 and $155,688 respectively, to entities controlled by FOD Capital LLC, a 5% shareholder of our common stock."

97. Additionally, the R-KEY-MOTO transaction included the sale of 21 FUVs. Arcimoto sold FUVs for approximately $20,000 each. Thus, the R-KEY-MOTO transaction was for approximately $420,000, well over $120,000. Moreover, the Company admitted that it had "delivered its first 8 FUVs to the franchisee by the end of 2019."

## B.    The Omission of the Related Party Transactions Violated GAAP

98. GAAP also required the Company to disclose all material related party transactions. Per ASC 850-10-50-1 (formerly FAS No. 57), Arcimoto's financial statements filed with the SEC should have included disclosures of material related party transactions.    Under GAAP, the Company's disclosures should have included, *inter alia*:

a.  The nature of the relationship(s) involved.

b.  A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements.

c.  The dollar amounts of the transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period.

d.  Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. Notes or accounts receivable from officers, employees, or affiliated entities must be shown separately and not included under a general heading such as notes receivable or accounts receivable.

ASC 850-10-50-2.

99. GAAP requires these disclosures because *"[t]ransactions involving related parties cannot be presumed to be carried out on an arm's-length basis, as the requisite conditions of competitive, free-market dealings may not exist."* ASC 850-10-50-5.

100.  GAAP constitute those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

101.  GAAP are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

102.  The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB"). FASB maintains the Accounting Standards Codification ("ASC"), which is the authoritative source of GAAP in US accounting practices.

103.  SEC, NYSE, and NASDAQ rules and regulations require that publicly traded

companies such as Arcimoto include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. See Section 13 of the Exchange Act; SEC Rule 10-01(d) of Regulation S-X. FUV common stock trades on the NASDAQ exchange, and NASDAQ rule 5630(a) required the disclosure of related party transactions pursuant to Item 404 of Regulation S-K.

104.    SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

105.    Management retains responsibility for preparing financial statements that conform with GAAP. The American Institute of Certified Public Accountants Professional Standards, vol. 1, AU § 110.03 (1998), provides as follows:

The financial statements are management's responsibility ... Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. ... Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

106.    ASC 850, Related Parties, provides that a public company's "[f]inancial statements shall include disclosures of material related party transactions." ASC 850-10-50-1.

107.    "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." ASC 850-10-50-3. "Affiliate" includes any company that, directly or indirectly through one or more

intermediaries, controls, is controlled by, or is under common control with an enterprise. ASC 850-10-20. "Principal owner" includes any person or entity who is an owner of record or known beneficial owner of more than 10% of the voting interests of the enterprise. ASC 850-10-20.

108. Disclosures of related party transactions shall include: (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. ASC 850-10-50-1.

109. R-KEY-MOTO was a related party of Arcimoto due to its ownership and control by FOD Capital and Raymond, who owned nearly 10% of Arcimoto's common stock and voting interests, including at the time of Arcimoto's transactions with R-KEY-MOTO. Moreover, FOD Capital and Raymond were the second-largest shareholders of Arcimoto after defendant Frohnmayer, and therefore had an outsize influence on the Company, including at the time of Arcimoto's transactions with R-KEY-MOTO.

110. The Company's transactions with R-KEY-MOTO were material, as the Company's sales of FUVs to FOD Capital represented nearly one fifth of the Company's vehicle sales revenues in 2019, and about 17% of its total 2019 revenues, and approximately 8% of the Company's vehicle sales revenues in 2020, and about 7% of its total revenues.

111.    Each of Arcimoto's 2019 10-K, 20Q1 10-Q, 20Q2 10-Q, and 20Q3 10-Q contained financial statements for Arcimoto that the Individual Defendants stated were "prepared in accordance with GAAP."

112.    The 2019 10-K, 20Q1 10-Q, 20Q2 10-Q, and 20Q3 10-Q were materially false and misleading because R-KEY-MOTO was a related party to Arcimoto and, in accordance with GAAP, Arcimoto was required to, but did not, disclose its material transactions with R-KEY- MOTO including: (a) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (b) the dollar amount of transactions for each of the periods for which income statements are presented, and (c) amounts due from or to the companies as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. *See* ASC 850-10-50-1.

## VIII.   DAMAGES TO ARCIMOTO

113.    Arcimoto has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

114.    As a direct and proximate result of the Individual Defendants' conduct, Arcimoto has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

   a.   legal fees associated with the lawsuits filed against Arcimoto and its officers and directors for violations of the federal securities laws, including *In re Arcimoto Inc. Securities Litigation*, Case No. 21-cv-02143-BMC (E.D.N.Y.) (the "Securities Action");

   b.   loss of reputation and goodwill, and a "liar's discount" that will plague

the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

c.  amounts paid to outside lawyers, accountants, and investigators in connection with investigations, including but not limited to the SEC investigation and the U.S. Attorney investigation;

d.  loss of revenues and profits.

## IX.    DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

115.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

116.    Plaintiff is a current shareholder of the Company, was a shareholder of the Company at the time of the Individual Defendants' wrongdoing alleged herein and has been a shareholder of the Company at all relevant times.

117.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

118.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously pursue this action.

119.    The Board currently consists of five (5) directors: defendants Frohnmayer, Becker, Calderon, Scherer and Eisler.    A derivative plaintiff need only demonstrate reason to doubt that half of the directors are disinterested or objective in order to establish pre-suit demand excusal. Plaintiffs have adequately alleged that there is reason to doubt that at least three (3) current directors of Arcimoto

36 - VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

are capable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action, for the following reasons:

### A.    Defendant Frohnmayer is Not Independent

120.    Defendant Frohnmayer is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action because defendant Frohnmayer's principal professional occupation is his employment as CEO of the Company.

121.    Accordingly, defendant Frohnmayer is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against those defendants who control his annual compensation. The Company's Proxy Statements on Form DEF 14A also admit that defendant Frohnmayer is not independent.

### B.    Defendant Becker is Not Independent

122.    Defendant Becker is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action because defendant Becker's principal professional occupation is his employment as COO of Arcimoto.

123.    Accordingly, defendant Becker is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against those defendants who control his annual compensation. The Company's Proxy Statements on Form DEF 14A also admit that defendant Becker is not independent.

### C.    A Majority of the Board Face a Substantial Liklihood of Liability Based on the Core Product Doctrine

124.    The Company's primary product is the FUV. Accordingly, defendants

Frohnmayer, Becker, Scherer, Eisler, and Calderon are presumed to know about the Company's primary customers and large sales orders, as well as Arcimoto's large stockholders. Thus, they knew or should have known of the nature of the related-party deals that they failed to disclose to stockholders in violation of SEC regulations, GAAP, and NASDAQ rules.

**D.**     **A Majority of the Board Face a Substantial Likelihood of Liability Because They Signed False and Misleading SEC Filings**

125.    The Individual Defendants had a duty to ensure that the Company's SEC filings did not contain material omissions. Again, each Individual Defendant failed to do so. A director's breach of the duty of candor is not entitled to protection under the business judgment rule.

126.    Defendants Frohnmayer, Becker, Calderon, Scherer and Eisler each signed the Company's 2019 10-K, which contained materially false and misleading statements and/or failed to disclose the related party transactions between the Company and FOD Capital/Raymond in violation of SEC regulations, GAAP, and NASDAQ rules. As such, defendants Frohnmayer, Becker, Calderon, Scherer and Eisler each face a substantial likelihood of personal liability, excusing demand. Their knowing and/or reckless breaches of fiduciary duty constitute bad faith. Bad-faith conduct is non-exculpable and is not protected under the business judgment rule. Thus, Frohnmayer, Becker, Calderon, Scherer and Eisler face a substantial likelihood of liability. Demand is thus futile and excused.

**E.**     **A Majority of the Board's Audit Committee Members Face a Substantial Likelihood of Personal Liability**

127.    Defendants Calderon, Eisler, and Scherer served on the Board's Audit Committee during the Relevant Period when the alleged misconduct occurred

concerning the misleading statements regarding related party transactions with FOD Capital and Raymond. According to the Audit Committee Charter, its members are required to "promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company." They failed to do so by permitting the Company to make public statements which failed to disclose the related party transactions with FOD Capital and Raymond. In so doing, Calderon, Eisler and Scherer breached their non-exculpable fiduciary duties of loyalty and good faith to the Company and its stockholders. Accordingly, defendants Calderon, Eisler and Scherer each face a substantial likelihood of liability, excusing demand.

## COUNT I

### Breach of Fiduciary Duty Against the Individual Defendants

128.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

129.    The Individual Defendants, as current or former Arcimoto officers and/or directors, owe (or owed) the Company the fiduciary duties of due care, loyalty, good faith, candor, oversight, reasonable inquiry, and supervision.

130.    By virtue of their positions as Arcimoto directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein.

131.    Each Individual Defendant was required to: (a) use his or her ability to control and manage Arcimoto in a fair, just, and equitable manner; and (b) act in

furtherance of the best interests of Arcimoto rather than his or her own interests.

132.    By their acts alleged herein, including but not limited to causing Arcimoto to issue false and misleading statements while concealing material adverse information and failing to ensure that the Company maintained adequate internal controls regarding financial disclosures, the Individual Defendants each breached their fiduciary duties.

133.    The Individual Defendants acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

134.    Arcimoto has been injured as a direct and proximate result of the Individual Defendants' wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Directing Arcimoto to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.    Awarding to Arcimoto restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: June 1, 2022

Respectfully submitted,

_____

**Jeffrey S. Ratliff**
RANSOM, GILBERTSON, MARTIN &
RATLIFF, LLP
5441 S. Macadam Avenue Suite 301
Portland, OR 97239
T: 503-226-3664
E-mail: rgmr1500@gmail.com
            jeffreysratliff@gmail.com

Of Counsel:
**Gustavo F. Bruckner**
*pro hac vice* forthcoming
**Daryoush Behbood**
*pro hac vice* forthcoming
POMERANTZ LLP
600 Third Avenue
New York, NY 10016
(212) 661-1100
E-mail: gfbruckner@pomlaw.com

## VERIFICATION

I am a plaintiff in the within action. I have reviewed the allegations made in this stockholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations to which I have personal knowledge, I believe those allegations to be true. To those allegations which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 26 day of May 2022.

_____
Signature

Sherrie Adams
Print Name